## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELIANA DAVIS,** | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | **Case No.:** 2:22-cv-94 |
| **v.** | : | |
| | : | |
| | : | |
| **CREATIVE DIALOGUES, LLC,** | : | |
| | : | **COMPLAINT IN CIVIL ACTION** |
| *Defendant.* | : | |
| | : | |

Filed on Behalf of Plaintiff:
Eliana Davis


Counsel of Record for this Party:
**J.P. WARD & ASSOCIATES, LLC**


Joshua P. Ward
Pa. I.D. No. 320347



J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206



Telephone:       (412) 545-3015
Fax No.:         (412) 540-3399
E-mail:          jward@jpward.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELIANA DAVIS,** | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | **Case No.:** |
| v. | : | |
| | : | |
| | : | |
| **CREATIVE DIALOGUES, LLC,** | : | |
| | : | **COMPLAINT IN CIVIL ACTION** |
| *Defendant*. | : | |
| | : | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Eliana Davis, by and through the undersigned counsel, J.P Ward & Associates, LLC and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, Creative Dialogues, LLC, of which the following is a statement:

## PARTIES

1.      Plaintiff, Eliana Davis (hereinafter "Ms. Davis"), is an adult individual who currently resides at 38 Maplewood Avenue, Pittsburgh, Pennsylvania 15205.

2.      Defendant Creative Dialogues, LLC, (hereinafter "Creative Dialogues"), is a corporation with a principal place of business located at 3875 Franklintowne Court, Suite 220, Murrysville, Pennsylvania 15668.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper as Ms. Davis brings this lawsuit under the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* and 42 U.S.C. §1983.

4.      This Court has supplemental jurisdiction over Ms. Davis' state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Ms. Davis is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

## PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

6.      On or about January 12, 2021, Ms. Davis initiated employment with Creative Dialogues as a Direct Support Professional.

7.      Ms. Davis' duties included assisting a client under the age of 18 on the autism spectrum with daily tasks in her home.

8.      Further, Ms. Davis was responsible for ensuring her client's safety and overall mental and emotional wellbeing.

9.      A Direct Support Professional has no power to speak in the name of any Pennsylvania or Creative Dialogues policymaker. Additionally, the position has no input into any decision making regarding the scope and/or nature of Creative Dialogues functions.

10.     On or about December 6, 2021, Ms. Davis was informed by Coworker, Autumn Schafer (hereinafter, "Ms. Schafer"), that she had tested positive for Coronavirus ("COVID-19") and had therefore exposed Ms. Davis' client the night prior.

11.     Thereafter, Ms. Davis sent a text message within the company group chat forum on the "Slack" application, to which included Supervisor, "Connie" (hereinafter, "Ms. Connie"), Supervisor, "Tommy" (hereinafter, "Ms. Tommy"), and Manager/Owner, Kelly Jones

(hereinafter, "Ms. Jones"). Ms. Davis reported the exposure to COVID-19, identified the client, and requested the company polices and protocols for COVID-19 exposures.

12.    Additionally, Ms. Davis was concerned for her own health, as she was scheduled to visit the exposed client in her home that Friday, December 10, 2021.

13.    Creative Dialogues replied with the Center for Disease Control ("CDC") guidelines, to which explained the need for fully vaccinated individuals to receive a COVID-19 test 5-7 days following their exposure regardless of the presence of symptoms. A true and correct copy of the messages are attached hereto, made a part hereof, and marked as Exhibit "A".

14.    Significantly, Ms. Connie promptly deleted Ms. Davis' report of the exposure and request for further information concerning company protocols related to COVID-19. Following her deletion of the message, Ms. Connie verbally berated Ms. Davis for her internal complaint.

15.    Ms. Davis attempted to explain her motive behind her internal report of the exposure, as she wanted to ensure all staff was aware of the health hazard to protect all clients, to whom are unable to protect themselves due to their mental disabilities. However, her explanation fell on deaf ears.

16.    The night before her scheduled visit with her client, on or about December 9, 2021, Ms. Davis called the on-call lead, "Justice", (hereinafter, "Ms. Justice") to inquire if her client had been tested due to her upcoming visit for the following afternoon.

17.    Ms. Justice assured Ms. Davis that the client had tested negative for COVID-19, and she was therefore able to attend the visit without exposing herself or others to the virus.

18.    The following morning, Ms. Davis received a call from Ms. Connie to request she take her client to an anime convention. Ms. Davis expressed her concerns regarding the scheduled

visit due to the exposure to COVID-19 and lack of proof of a negative test. Further, Ms. Davis requested to call Ms. Connie back in 30 minutes following her evaluation of the situation.

19.     Thereafter, Ms. Davis called Ms. Connie back as promised, but did not receive a response. Ms. Davis then texted Ms. Connie requesting a return call at her earliest convenience.

20.     Ms. Connie never returned Ms. Davis' call. Rather, Ms. Connie merely texted Ms. Davis to ask if she was calling off work.

21.     Ms. Davis informed Ms. Connie of her plan to attend work and once again requested a phone call. Ms. Connie never called Ms. Davis.

22.     Following Ms. Davis' guarantee the client had tested negative for COVID-19, Ms. Davis attended her scheduled visit with her client. During their meeting, the client informed Ms. Davis that she had not been tested for COVID-19 following her exposure.

23.     Ms. Davis immediately raised her concerns to Ms. Tommy who was on site at the time of the visit. Further, Ms. Davis requested a copy of the alleged negative COVID-19 test.

24.     Ms. Tommy stated she was never provided with a negative COVID-19 test result for the client. Rather, Ms. Tommy alleged she only had an email she had sent to the client's school so she would be permitted to return.

25.     Further, Ms. Tommy alleged the client was "playing her" because she knew if Ms. Davis was unable to attend the visit, the client would be allowed to go to a company bowling day with the other clients. The client was not permitted to attend the event due to her prior violation of company guidelines.

26.     Lastly, Ms. Tommy informed Ms. Davis she would need to speak with Ms. Connie to obtain a record of the client's alleged negative COVID-19 test results.  Ms. Tommy stated that if the text results existed, they would be on file at Creative Dialogue's office.

27.     Thereafter, Ms. Davis called Ms. Connie to report her client's statement regarding the lack of COVID-19 test and request the documentation of her test results.

28.     Within her report, Ms. Davis explicitly stated, "I am upset that you lied to me. You are putting everyone at risk."

29.     Rather than provide Ms. Davis with the alleged negative test result, Ms. Connie stated she had informed the company to send Ms. Davis to a different client due to the exposure. Ms. Connie then told Ms. Davis to leave that site and report to the other site immediately.

30.     Ms. Davis raised concerns regarding this request, as she stated she did not want to expose another client due to the apparent risk of exposing another client, and due to the fact that nobody could verify a negative COVID-19 test result for the prior client.

31.     On December 10, 2021, immediately following her verbal report to Ms. Connie, Ms. Tommy approached Ms. Davis and stated, "You can go, and today is your last day of employment."

32.     Ms. Davis complied with Ms. Tommy's orders and began to gather her things to leave the site. During this time, Ms. Tommy called Ms. Connie and stated she had terminated Ms. Davis' employment as a result of her alleged "refusal to go to another house."

33.     During that call, Ms. Davis interjected and stated, "I am not refusing anything. I would just like to know if she was tested."

34.     Ms. Tommy replied that they did not have any documentation to confirm or deny that client was tested for COVID-19.

35.     Therefore, upon information and belief, Creative Dialogues was unable to proffer the alleged negative COVID-19 test, as protocol of a negative COVID-19 test following exposure had not been followed as previously assured by Creative Dialogues.

36.     Therefore, on or about December 10, 2021, Ms. Davis was terminated from her employment as a result of her formal report of wrongdoing and abuse, relative to Creative Dialogues' failure to ensure a negative COVID-19 test following an exposure per company and CDC protocols.

## COUNT I
## RETALIATION AND TERMINATION IN VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW

37.     Ms. Davis incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

38.     The Pennsylvania Whistleblower Law (hereinafter "PWL") is "chiefly a remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc*., 166 A.3d 465, 475 (Pa Super. 2017).

39.     Under the PWL, 43 Pa. Stat. Ann. §§1421-1428, a "whistleblower" is "a person who witnesses of has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority." *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015) (citing 43 Pa. Stat. Ann §1422).

40.     Under 43 P.S. §1423(b), "the reported wrongdoing must either be that of the employer or a violation of a law or code of conduct that the employer is charged to enforce for the good of the public." *Sea v. Seif*, 831 A.2d 1288, 1292 (Pa. Commw. Ct. 2003).

41.     The PWL defines an appropriate authority as "a federal, state, or local government body, agency, or organization having jurisdiction over criminal law enforcement, regulatory

violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency, or organization." 43 P.S. §1422.

42.    Under the PWL, an employer is "a public body" because it "receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body: an individual, a partnership, an association, a corporation for profit, or a corporation not for profit." 43 P.S. §1422.

43.    Upon information and belief, Creative Dialogues receives public funds, thereby making it an employer of Ms. Davis as defined by the PWL.

44.    The violations of health and safety, including but not limited to, the false assurance of the client's negative COVID-19 test, the subsequent subjection of Ms. Davis, all employees, and all vulnerable clients to COVID-19, and the deletion of Ms. Davis' message in the "Slack" application informing her coworkers of the exposure, are considered "wrongdoing" as defined by PWL as the violations were not of a "merely technical or minimal nature."

45.    Upon witnessing this wrongdoing and/or waste and perceived violations of OSHA while working for Creative Dialogues, Ms. Davis made several good faith reports to her supervisors as defined in the PWL.

46.    Under the PWL, an employer may not "discharge, threaten, or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location, privileges or employment because the employee is requested by an appropriate authority to participate in an investigation, hearing, or inquiry held by an appropriate authority." 43 P.S. §1423.

47.     Following Ms. Davis' reports of the wrongdoing to the appropriate authorities, Ms. Davis was retaliated against in the form of being terminated from her position at Creative Dialogues with no prior warning and pretextual reasoning.

48.     Defendant's actions were knowing, intention, and done in reckless or conscious indifference to the rights of Plaintiff.

49.     As a direct and proximate result of the aforementioned conduct, Ms. Davis suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish and emotional distress all in the past present and future.

WHEREFORE, Ms. Davis hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Ms. Davis requests this Court award her back pay, front pay, compensatory damages, costs, and reasonable attorney's fees, in addition to such other relief as deemed just and proper.


**COUNT II**
**Common Law Wrongful Termination - Violation of a Clear Mandate of Public Policy by Failure to Provide Safe Work Environment in Violation of the Federal OSH Act as Adopted by Pennsylvania Law Under the Pennsylvania Worker and Community Right-to-Know Act, 35 P.S. § 7319**

50.     Ms. Davis incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

51.     In the Commonwealth of Pennsylvania, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikkhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013).

52.     However, an at-will employee "will be entitled to bring a cause of action for a termination of that relationship . . . where the termination implicates a clear mandate of public policy in the Commonwealth of Pennsylvania." *McLaughlin v. Gastrointestinal Specialists, Inc*., 750 A.2d 283, 287 (Pa. 2000).

53.     Pennsylvania courts define public policy "by reference to the laws and legal precedents and not from supposed public interest." *Id*. at 288.

54.     Under Pennsylvania law, it is well-established that the federal OSH Act is incorporated into the PWCRA, 35 P.S. § 7319 and that the two are to be read in conjunction with one another.  See *Beck v. CNO Fin. Crp., Inc.*, 2018 WL 2984854 (Pa. E.D. Jun. 14, 2018); *Dille v. Day & Zimmerman NPA*, 2015 WL 3884889 (Pa. E.D. Jun. 24, 2015); *Lambert v. Envtl. Restoration Group Inc.*, 2008 WL 723328 (Pa. W.D. May 14, 2008); *Romig v. Northampton County Dep't of Corr.*, 2008 WL 818798 (Pa. E.D. Mar. 21, 2008); *Helfrich v. Lehigh Valley Hosp.*, 2005 WL 670299 (Pa. E.D. Mar. 18, 2005); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, 2005 WL 2455253 (E.D. Pa. Oct. 5, 2005); *Wetherhold v. Radio Shack Corp.*, 339 F. Supp. 2d 670 (Pa. E.D. 2004).

55.     PWCRA § 7319(b) states:

> Construction with Federal law. – This act is to be read in conjunction with any provision of Federal law providing for the identification, labeling or providing of information concerning hazardous substances and is intended to supplement such Federal regulation in the interests of protecting the health and safety of citizens of the Commonwealth.

35 P.S. § 7319(b).

56.     When read together, the two are sufficient "to overcome a strong presumption in favor of the at-will employment be an objective reading of PWCRA §7319(b) supports that a Commonwealth health and safety law reflects 'the same public policy expressed by the federal

government under OSHA.'" *Wetherhold v. Radio Shack Corp.*, 339 F. Supp. 2d 670, 681 (Pa. E.D. 2004).

57.     Therefore, the policies expressed in the OSH Act are considered the public policies of the Commonwealth of Pennsylvania, which gives rise to a claim of wrongful termination when an employer retaliates against an employee for voicing complaints about real or perceived OSHA violations.  The court in *Wetherhold* found that PWCRA §7313 and OSH Act 29 U.S.C.A. §660 were sufficiently analogous for 29 U.S.C.A. §660 to be adopted as public policy under Pennsylvania law. *Id*. at 681.

58.     Creative Dialogues did not provide a safe environment for its employees by failing to enact adequate safety measures and inform Ms. Davis of her client's lack of negative COVID-19 test to prevent the spread of an airborne virus, to which is a public health concern.

59.     Creative Dialogues was notified by Ms. Davis that safety protocols were not observed.

60.     Creative Dialogues misrepresented that a client received a negative COVID-19 test per company protocol.

61.     Additionally, Ms. Davis informed Creative Dialogues that there was an acute risk of exposing other clients, yet, Creative Dialogues instructed Ms. Davis to report to another site to service another client.

62.     Ms. Davis reported her concerns to Creative Dialogues, direct supervisors, and upon the company chat application known as "Slack".

63.     Creative Dialogues violated the public policy of the Commonwealth when it retaliated against and terminated Ms. Davis for making such reports.

64.     As a direct and proximate result of the above-mentioned breach, Ms. Davis suffered actual damages, loss of income, lost wages, emotional distress, annoyance and embarrassment.

65.     Creative Dialogues' actions were knowing, intentional, reckless, and done with conscious indifference to the rights of Ms. Davis.

WHEREFORE, Ms. Davis hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Ms. Davis requests this Court award her back pay, front pay, any other compensatory damages, costs, punitive damages, and such other relief as deemed just and proper.

<u>COUNT III</u>
**RETALIATION FOR SPEAKING ON A MATTER OF PUBLIC CONCERN IN VIOLATION OF 42 U.S.C. §1983**

66.     Ms. Davis incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

67.     Creative Dialogues terminated Ms. Davis' employment in retaliation for her report of Creative Dialogues' exposure to COVID-19 and subsequent violation of company and State protocol.

68.     Ms. Davis spoke as a citizen on a matter of public concern.

69.     Therefore, Creative Dialogues terminated Ms. Davis in violation of her rights to speak freely and to petition for the redress of grievances under the First and Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. §1983.

70.     At all times relevant hereto, Creative Dialogues acted under color of state law, inasmuch as their acting as set forth at length above, constitute misuse of power possessed solely by virtue of state law and made possible only because Creative Dialogues is and was clothed with the authority of state law.

71.     Ms. Davis, as a citizen, has a right to speak on matters of public concern under the First and Fourteenth Amendments of the United States Constitution.

72.     As set forth above, Davis was acting as a citizen both speaking upon matters of public concern and petitioning for redress of grievances, therefore, her speech and the action of petitioning are protected under the First and Fourteenth Amendment of the United States Constitution.

73.     Ms. Davis, as a citizen of the United States, did not surrender her rights and privileges under the United States Constitution as a condition of employment with Creative Dialogues.

74.     As described above, Creative Dialogues fired Ms. Davis in retaliation for her exercise of her First and Fourteenth Amendment right to speak on matters of public concern and to petition for redress of grievances.

75.     Creative Dialogues' actions were knowing, intentional, reckless, and done with conscious indifference to Ms. Davis' federally protected right to exercise her First Amendment rights.

76.     The conduct by Creative Dialogues, as set forth above, was a conscious choice on the part of Creative Dialogues to disregard Ms. Davis' constitutional rights and deprived Ms. Davis under color of state law, rights of speech, and petition under the First and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. §1983.

77.     As a direct and proximate result of the above-mentioned breach, Ms. Davis suffered actual damages, loss of income, lost wages, emotional distress, annoyance and embarrassment.

WHEREFORE, Ms. Davis hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Ms. Davis requests this Court award her back pay, front pay,

any other compensatory damages, costs, punitive damages, and such other relief as deemed just and proper.

**JURY TRIAL DEMANDED.**

Respectfully Submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: January 17, 2022                    By: _____
Joshua P. Ward (Pa. I.D. No. 320347)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Counsel for Plaintiff